FILED
U.S. DISTRICT COURT

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH - CENTRAL DIVISION

2006 OCT 23   A 9: 56

DISTRICT OF UTAH

| | |
|---|---|
| JON C. JONES, <br><br> Plaintiff, <br><br> vs. <br><br> THE WRIGHT TRAVEL AGENCY, INC., <br><br> Defendant. | **ORDER AND OPINION** <br><br> Case No.  2:04-CV-724-DB <br><br> Judge Dee Benson |

## I.   Introduction

This matter came before the Court for a three-day bench trial on July 18-20, 2006. Plaintiff Jon C. Jones was represented by Patricia W. Christensen and Michael D. Black of the law firm of Parr Waddoups Gee & Loveless.  Defendant Wright Travel Agency, Inc. was represented by Mark F. James and Kevin W. Bates of the law firm of Hatch, James & Dodge.

Having considered the pleadings submitted by the parties, the testimony of the witnesses, and the arguments of counsel, the Court makes the following findings of fact and conclusions of law.

## II.   Background

Plaintiff Jon C. Jones owned and operated a travel agency, "Travel Zone," in Salt Lake City, Utah.  Travel Zone was comprised of about 40 employees and sold personal and group vacation packages and arranged travel plans for local businesses.  Pamela Wright is the founder, sole owner and President of Defendant Wright Travel Agency Inc., a travel agency headquartered in Nashville, Tennessee with approximately 20 locations across nine states.  In early 2003, Ms. Wright contacted Mr. Jones through a broker in order to inquire about purchasing Travel Zone. Mr. Jones agreed to sell Travel Zone and the parties entered into an Asset Purchase Agreement in

June 2003.  The Purchase Agreement stated that in consideration for acquiring the assets of Travel Zone, Wright Travel agreed to pay Mr. Jones $200,000 plus 13% of the "revenues" that the Salt Lake office made over a 24-month period immediately following acquisition.  In the months following the acquisition, however, revenues declined and many of the employees who had worked for Travel Zone prior to the acquisition either left or were terminated.  Several customers who had been served by those employees left also.  Because of Travel Zone's depressed revenues after its acquisition by Wright Travel, Mr. Jones' share in the revenues was much less than he anticipated.  Mr. Jones brought suit to recover damages alleging that Wright Travel breached the Implied Covenant of Good Faith and Fair Dealing by intentionally mismanaging its Salt Lake office.

Wright Travel filed a counterclaim against Mr. Jones alleging that he breached the contract by failing to perform certain consulting duties after Travel Zone's acquisition.

### III.    Findings of Fact

1.    Wright Travel and Travel Zone negotiated an Asset Purchase Agreement ("APA") and related documents pursuant to which Wright Travel purchased certain assets of the Travel Zone.

2.    The APA was signed effective June 29, 2003.

3.    Wright Travel paid Travel Zone a lump sum payment of $200,000.00 at the closing. In addition, Wright Travel agreed to pay Mr. Jones 13% of Wright Travel's Revenues (a term defined in the APA) for the 24-month period following the acquisition.[1]

---

[1]With respect to group travel, the APA provided that Wright Travel would pay Mr. Jones 13% of Revenues booked within the 24-month period immediately following the acquisition, so long as the travel actually occurred within the 36-month period immediately following the acquisition.

4.      At no time during the negotiations of the APA did the parties suggest or agree that either

party would be guaranteed minimum payments or minimum earnings during the two-year

earn out period following the acquisition

5.      In addition to the APA, the parties entered into a Consulting Agreement under which Mr.

Jones agreed to provided specific client-related services to the agency and its clients, on a

commission basis, following the closing.  Specifically, the Consulting Agreement

provides that:

> For two years beginning June 29, 2003 ("Effective Date"),
> Consultant shall provide (or cause Jon C. Jones to provide, as applicable)
> the following independent-contractor services to Company:
> (a)      Contact the clients of Consultant's former travel agency, The Travel
>            Zone, to announce the transition from Consultant to Company
> (b)      Assist Company to establish rapport with said clients.
> (c)      Be available as needed by Company to visit the largest of said
>            clients during the first three months after the Effective Date at such
>            times and places are mutually agreeable with Consultant and
>            Company.
> (d)      Advise Company about said clients
> (e)       Solicit and secure new corporate, group, meeting, and incentive
>            clients for the Company.

6.      In discussions between Pam Wright and Mr. Jones prior to the closing, Pam Wright

informed Mr. Jones that Wright Travel intended to ask all of the former employees of

Travel Zone to sign non-compete agreements following the acquisition that would restrict

employees' ability to provide travel services to or solicit travel service business from

clients or former clients of Wright Travel for a period of one year after the employee's

employment with Wright Travel had ended.

7.      Mr. Jones was opposed to non-compete agreements but determined to proceed with the

closing.

8.      Pam Wright discussed with Mr. Jones on two or three occasions prior to the signing of

3

the APA that Mr. Jones would not be involved in the management of the Salt Lake office following the acquisition.

9.      Following the closing, Pam Wright maintained much of the same management structure in place that had existed at the Travel Zone prior to the acquisition. Debbie Huddleston remained as manager of the corporate-travel division, Marcia Johnson as manager of the leisure-travel division, and Jan Beames as manager of the group-travel division. Pam Wright also frequently utilized Debbie Huddleston and Marcia Johnson as the on-site office manager.[2]

10.     Soon after the closing, Pam Wright met with all of the employees of Wright Travel's Salt Lake office and explained Wright Travel's employment policies to them. Pam Wright asked the employees to sign Wright Travel's standard form employment agreement that contained a non-compete restriction. Employees were not required to sign the employment agreement, however, and were offered monetary incentives in the form of cash and airline tickets if they did sign.

11.     Many of the employees in Wright Travel's Salt Lake City office signed the Wright Travel employment agreements containing the non-compete restrictions.

12.     Pam Wright returned to Salt Lake City several times in July and August of 2003 to answer questions regarding policies and procedures and to address various issues relating to the transition. Mr. Jones and Pam Wright had discussed prior to the acquisition that certain administrative functions would be consolidated post-acquisition and some administrative positions in the Salt Lake office would be eliminated.

_____

[2]Later, in March 2004, Wright Travel hired Jane Engle as the full-time office manager of the Salt Lake office. Prior to that time, Pam Wright had interviewed numerous candidates for the office manager position and had offered the position to Carrie Jenkins, a former employee, and then to Amy Mendoza, a current employee, but both of them declined.

13.   During the month immediately following the acquisition, Wright Travel eliminated the human resources position in the Salt Lake office.  Pam Wright asked Carrie Jenkins, who had been the HR director in the Salt Lake office, if she would remain with the agency in another position.  Ms. Jenkins declined.  Several months later, Pam Wright asked Ms. Jenkins to return and manage the Salt Lake office of Wright Travel.  Ms. Jenkins again declined.

14.   Wright Travel eventually transitioned accounting from the Salt Lake office to its Nashville, Tennessee headquarters and, in connection with that transition, several accounting positions in the Salt Lake office were eliminated.

15.   Several employees who had not earned bonuses but expected to receive bonuses for the quarter ending June 2003 became upset.  In addition, employees who earned bonuses received the bonus payment late.

16.   Commencing with disgruntlement relating to bonuses not being paid, certain employees left their employment with what had become Wright Travel's Salt Lake City office.

17.   Many of the employees at the Travel Zone were friends of Mr. Jones who had worked for the Travel Zone for many years.  With Mr. Jones no longer playing a role in the management of the office, and the Salt Lake office having become a branch office of a larger company, Travel Zone agents started to leave.  The effect was domino in nature and was contributed to by competitors in the industry who sought to hire away Travel Zone agents.

18.   Eventually, every employee of the Travel Zone as of the date of the acquisition left their employment with the Salt Lake office of Wright Travel.  The Wright Travel Salt Lake office was badly injured.  As agents left, the remaining agents experienced difficulty

5

performing services for clients adequately, morale dropped as clients left the Salt Lake office to follow departing agents elsewhere, and, as a result, more agents left, other clients ceased using Wright Travel's Salt Lake City office, and business further declined.

19.   Pam Wright recruited new agents for Wright Travel's Salt Lake office, and during the months following the acquisition, the Salt Lake office hired a variety of new agents. Because of problems the Salt Lake office was experiencing, it was difficult to hire new agents to work for the Salt Lake office.

20.   Following the acquisition, Pam Wright made numerous visits to clients of Travel Zone in an effort to cultivate continuing and additional business from those clients for the Salt Lake Office of Travel Zone.

21.   During the year following the acquisition, Pam Wright flew to Salt Lake City at least 17 times to encourage departing agents to stay, interview and hire new agents, and visit clients and seek new business. The majority of those visits occurred after August, 2003.

22.   Pam Wright never instructed any employee not to solicit or attempt to obtain new group travel or other business for the Salt Lake office of Wright Travel. She encouraged and sought new group travel opportunities, new clients for the Salt Lake office, and more business for the office.

23.   Since the acquisition, Pam Wright hired at least eleven new agents to replace agents who had left the employ of Wright Travel in Salt Lake City, in addition to hiring a new office manager in March, 2004.

24.   Wright Travel continues to operate an office in Salt Lake City as of the date of the trial.

25.   From the date of the acquisition to the present Wright Travel's Salt Lake City office has operated at an overall net loss of approximately $150,000.

6

26. From the date of the acquisition to the present, Wright Travel has paid Mr. Jones and/or Travel Zone, Inc. over $435,000.00.

27. Mr. Jones testified in his deposition taken in the case, and he acknowledged at trial, that he had no reason to believe Pam Wright did not want the Salt Lake office of Wright Travel to be as successful as possible. He further testified Pam Wright never said or did anything that caused him to believe that she did not want the Salt Lake office of Wright Travel to be as profitable as it could be. Mr. Jones further testified he was not aware of anything Wright Travel intentionally did to try to drive away employees that existed at the time of the closing. Mr. Jones also acknowledged that his economic interests and those of Wright Travel were aligned during the two-year period following the acquisition.

28. The atmosphere of the office changed after the acquisition and she left soon thereafter. Agents left and took a substantial amount of clients and business with them.

29. The acquisition was very difficult for many employees. The Travel Zone employees had been like family, and Mr. Jones was the glue that held them together. At the time Amy Mendoza left the office, while new agents had been hired, they were not well trained to use Worldspan software and although Wright Travel had sent two individuals to Salt Lake from other Wright Travel locations, the amount of time spent for the training was not sufficient.

30. None of the former Travel Zone employees testified or suggested that Pam Wright did not want the Salt Lake office to be successful or identified anything that would manifest bad faith.

31. The Salt Lake office was Pam Wright's tenth acquisition and by far the most difficult. She spent more time and effort in connection with this acquisition than with any other. Ms. Wright did not intend to "liquidate" or otherwise sell off the business or any aspect

thereof. Ms. Wright encouraged every aspect of the business. The economic interests of Wright Travel and Jon Jones were always aligned. Ms. Wright did not attempt to deprive Jon Jones of revenues or any other reasonable expectation he might have had.

33. Pam Wright did not want employees to leave and attempted to convince them to stay. She made several trips to Salt Lake City to attempt to convince agents who had announced they intended to leave not to leave.

36. At all relevant times the economic interests of Mr. Jones and Pam Wright were aligned in every material way.

37. Wright Travel did not act intentionally to cause agents to leave following the acquisition or to cause the revenue received by the Salt Lake office of Wright Travel to decline following the acquisition.

38. Wright Travel did not act in bad faith in requesting that its employees sign employment agreements that restricted their ability to provide travel services to and/or solicit travel service business from clients or former clients of Wright Travel for a period of one year after the employee's employment with Wright Travel had ended.

39. Wright Travel did not act in bad faith in paying bonuses to employees in accordance with the written bonus policy that was in place at Travel Zone at the time of closing and in not paying bonuses to employees who had failed to qualify under that written policy.

40. Wright Travel did not act in bad faith in not involving Mr. Jones in the management of the Salt Lake office following the acquisition.

41. Wright Travel did not act in bad faith in connection with its operations of its Salt Lake office following the acquisition.

42. Wright Travel did not act in a manner to intentionally deprive Mr. Jones of the benefits of the APA. Moreover, the conduct of Wright Travel that Mr. Jones primarily alleged as the

8

basis for his breach of implied covenant of good faith and fair dealing claim (having employees sign non-compete agreements; Mr. Jones not being involved in management following the acquisition; and not paying unearned bonuses) did not injure Mr. Jones' reasonable expectations. Mr. Jones knew prior to signing the APA that Wright Travel intended to ask employees to sign non-compete agreements; that he would not be involved in management following the acquisition; and that Wright Travel had no obligation to pay bonuses that were contrary to the bonus program Mr. Jones had represented.

43.   Mr. Jones requested damages for breach of the implied covenant of good faith and fair dealing in the amount of $337,545. Such damages were testified to by Mr. Jones' damage expert, Scott Kimber. Because Mr. Jones failed to carry his burden of establishing that Wright Travel intentionally deprived Mr. Jones of his reasonable expectations under the APA, Mr. Jones is not entitled to recover damages for his claim asserting breach of the implied covenant of good faith and fair dealing.

44.   Mr. Jones claimed he was entitled to additional commissions in the amount of several thousand dollars from the Carpenter group trips to the Danube and to Kauai. In that regard, Mr. Jones claimed that Wright Travel improperly had deducted the commissions of its sales representative, Ernie Cummings, relating to those trips before calculating Mr. Jones' 13%. There was no evidence presented to show that those commissions should not have been deducted before his 13% share of revenues from those trips were calculated.

45.   The APA's definition of "Revenues" with respect to group travel provides specifically that direct expenses will be deducted before calculating Mr. Jones' 13% of revenues in connection with group travel. Ernie Cummings' commission with respect to the trips to

9

Danube and Kauai was reasonably treated as a direct expense because, had those trips not occurred, Ernie Cummings would have received no such commission – the commissions were incurred as a direct result of the trips.  Moreover, Travel Zone's bonus program provided that commissions should be deducted in connection with group travel before bonuses were calculated.

46.   Pam Wright's understanding and intent was that the sales commissions would be deducted before Mr. Jones' 13% share of group travel revenues was calculated.  There was no contrary evidence at trial.

47.   There was no evidence of any amounts Mr. Jones claimed he should have received had the sales commissions not been deducted prior to calculating Mr. Jones' 13% share.

48.   Mr. Jones also alleged that overtime and Pam Wright's expenses should not have been deducted in connection with the Carpenter trips to the Danube and Kauai before his share of Revenues were calculated.  No evidence was introduced at trial regarding what expenses were deducted that allegedly should not have been or of Mr. Jones' damages therefrom.  Such expenses were direct expenses associated with those trips and thus properly deducted.

49.   Mr. Jones also acknowledged that if there were a business purpose associated with the expenses of Pam Wright in connection the trips, Ms. Wright's expenses would be properly deducted.  Mr. Jones was not present on the Kauai trip, and the evidence presented at trial was that Pam Wright went on both of the Carpenter Company trips following the acquisition with the business purpose of assisting the trips and further seeking to build and establish the business relationship between Wright Travel and Jim Hardimon and the Carpenter Company.  There was no contrary evidence.

10

50.   Mr. Jones alleged certain payments were late in being made, claiming that the payments were made after the lawsuit was filed and thus were the result of Wright Travel's recognition that it had breached the APA.  Mr. Jones referenced payments in connection with the Carpenter Company group trip to Kauai and Mr. Jones's May commission payment.  Wright Travel did not receive payment from the Carpenter Company in connection with the trip to Kauai until September, 2004, and Mr. Jones received his share of revenues from that trip within 30 days following the calendar month in which Wright Travel had received/recognized payment, which was in accordance with the APA.

51.   Regarding Mr. Jones' May commission payment, that payment was not made until July because Mr. Jones had requested to review the accounting for his May commission before that accounting was sent to Nashville for payment, and Mr. Jones' delay in connection with his review resulted in a delay in the accounting being sent to Nashville and thus a slight delay in payment.  Moreover, and in any event, the commission payment was made before Mr. Jones filed and served his Complaint in this case and Mr. Jones accepted the payment.

52.   Mr. Jones assisted with a group travel experience for The Coca Cola Company in connection with the Sundance Film Festival held in Park City and Salt Lake City, Utah in January 2004.  In connection therewith, Mr. Jones used his personal vehicle.  He also incurred expenses of approximately $1,200 for which Wright Travel did not reimburse Mr. Jones.

53.   The APA did not require Wright Travel to pay Mr. Jones for the use of his vehicle in carrying out his duties under the Consulting Agreement or to reimburse Mr. Jones for expenses he incurred in connection with discharging his obligations under the Consulting Agreement.  Also, Mr. Jones' actions in relation to the Coca Cola group trip to the

11

Sundance Film Festival were made in an attempt to obtain additional work from the Coca Cola Company for himself in connection with the 2004 Olympics in Athens, Greece and the 2006 winter Olympics in Torino, Italy.

55.     Regarding Jon Jones' obligations under the Consulting Agreement, Mr. Jones contacted the clients of the Travel Zone to announce the acquisition, advised Wright Travel about those clients, and assisted Wright Travel to establish rapport with those clients.  Jon Jones was available to visit clients of the Travel Zone and made some efforts to solicit new clients.

56.     Wright Travel failed to show that any of Jon Jones alleged breaches of the Consulting Agreement caused damage to Wright Travel, or to establish the amount of any such damages.

## IV.   Conclusions of Law

1.      The Covenant of good faith and fair dealing prohibits a party to a contract from acting intentionally to frustrate the justified expectations of the other party.  Eggett v. Wasatch Energy Corporation, 94 P.3d 193, 197 (Utah 2004); Oakwood Village LLC v. Albertsons, Inc., 104 P.3d 1226 (Utah 2004).  "The court determines the 'purpose, intentions, and expectations' by considering the contract language and the course of dealings between and conduct of the parties."  Id. at 42.

2.      While a covenant of good faith and fair dealing inheres in almost every contract, some general principles limit the scope of the covenant:

> First, the covenant cannot be read to establish new, independent rights or duties to which the parties did not agree ex ante.  Second, this covenant cannot create rights and duties inconsistent with express contractual terms. Finally, [the Court] will not use this covenant to achieve an outcome in harmony with the court's sense of justice but inconsistent with the express terms of the applicable contract.

12

Id. at 45.

3.   Wright Travel did not breach the implied covenant of good faith and fair dealing contained in any of the agreements at issue in this action.

4.    In an attempt to support his breach of implied covenant of good faith and fair dealing claim, Mr. Jones criticized and took issue with primarily three decisions or actions taken by Wright Travel following the acquisition:  (1) not involving Mr. Jones in the management of the agency following the acquisition; (2) asking employees to sign non-compete agreements following the acquisition; and (3) strictly enforcing the bonus program and not continuing Mr. Jones' practice of awarding bonuses even on occasions when employees had not met the criteria for receiving them.  None of these decisions or actions support Mr. Jones' breach of implied covenant claim.

5.   Both parties to the transaction of the APA were represented by independent counsel, and neither party agreed to or intended that the contract would contain minimum guaranteed payments to either party or that Wright Travel would be precluded from exercising its business judgment regarding management and operation of the Salt Lake office following the acquisition.  The conduct and decisions of Wright Travel that Mr. Jones asserts as the basis for his breach of implied covenant claim fall well within the business judgment of Wright Travel.

6.   Mr. Jones could not have had a reasonable expectation that Wright Travel would have done something different than it did based on the fact that Mr. Jones and Pam Wright had discussed the very actions Mr. Jones subsequently asserted as the basis for his breach of implied covenant claim prior to the closing and Wright Travel acted post-closing entirely consistent with those discussions.

13

7.    Mr. Jones had no reasonable expectations at the time the APA was entered into that he would be involved in management of the business following the acquisition; that Wright Travel would not ask the employees to sign non-compete agreements; or that Wright Travel would not enforce the bonus plan in accordance with its terms as represented to Wright Travel in the APA. Absent justified expectations, there could be no breach of the implied covenant of good faith and fair dealing.

8.    The fact that employees left Wright Travel following the acquisition and the fact that Wright Travel experienced a severe decline following an acquisition does not sustain a conclusion that Wright Travel failed to act in good faith. The evidence at trial established that, after August, 2003, Pam Wright continued to travel to Salt Lake City; Wright Travel continued to seek to hire (and did hire) new agents; client visits continued; and efforts were made to seek new business and operate the agency in an effort to continue the business. Bids were made for ongoing group travel, software licenses were renewed, Wright Travel entered into a new, long-term lease, and the agency continues to operate in Salt Lake City, even though the Salt Lake office has operated from the time of the acquisition through the date of trial at a net loss of approximately $150,000.

8.    Unless the interests of the "party exercising discretion pursuant to the contract diverge from the interests of the contractual venture, courts need not scrutinize the motivation behind that party's exercise of business judgment. Self-interest ensures that the goal of profit maximization for the venture, not bad faith, guides the party's decisions." Interpublic Group of Companies, Inc. v. Fratarcangelo, 2002 WL 31682389 (S.D.N.Y. Nov. 26, 2002) at *14. "When the parties' economic interests are aligned, a claim for breach of the implied covenant . . . 'defies common sense and economic reality.' Under such circumstances, no 'reasonable trier of fact could conclude that [the defendant]

14

violated the implied covenant of good faith and fair dealing." Id. at *15. The economic
interests of Mr. Jones, Pam Wright, and Wright Travel were at all relevant times aligned.

9. Mr. Jones' breach of implied covenant claim fails because the evidence does not support
a finding that Wright Travel decided to "liquidate" its Salt Lake City office and thus the
Court need not reach the question of whether "liquidation" of the agency in Salt Lake
City following the acquisition, had that in fact occurred, would have been a breach of the
implied covenant of good faith and fair dealing.

10. Mr. Jones failed to carry his burden of establishing that Wright Travel breached the
implied covenant of good faith and fair dealing.

11. Mr. Jones is not entitled to be reimbursed for expenses he incurred in connection with the
Coca-Cola group at the Sundance Film Festival in January 2004.

12. Neither the APA nor the Consulting Agreement requires Wright Travel to reimburse Mr.
Jones for expenses he incurs in connection with discharging his duties under the
Consulting Agreement.

13. Sales commissions to Ernie Cummings paid on income from Carpenter Company group
trips to the Danube and Kauai, Pam Wright's expenses relating to those trips, and
overtime associated with those trips were properly deducted under the APA prior to
calculating Mr. Jones' 13% commissions for that group Revenue.

14. The APA provides that with respect to amounts due to Jon Jones deriving group travel
revenue, the revenue is first decreased by "direct expenses" prior to the calculation of the
amount due Mr. Jones.

15. Under the APA, "direct expenses" include commissions due to salesman paid on the
revenue specifically received from group travel and that would not have been paid but for
the generation of the revenue from the group travel.

16.    Under the APA "direct expenses" include the expenses of an employee or officer of Wright Travel who participates in a group trip with a legitimate business purpose. A legitimate business purpose includes but is not limited to assisting with the group and/or attempting to secure future business from the group client. Overtime and Pam Wright's out-of-pocket expenses on the Danube and Kauai trips were properly deducted as direct expenses.

17.    Mr. Jones failed to introduce any evidence at trial regarding the amounts he claimed were improperly deduced prior to calculating his share of revenues, and he failed to introduce any evidence as to the amount he claimed he was entitled to receive assuming Wright Travel improperly deducted overtime, Pam Wright's travel expenses, and/or Ernie Cummings' commissions and thus Mr. Jones failed to carry his burden with respect to those claims.

18.    Wright Travel did not breach the APA by making payments to Mr. Jones that were untimely.

19.    Mr. Jones failed to carry his burden of establishing that Wright Travel breached the APA.

20.    Wright Travel has failed to carry its burden of establishing that Jon Jones breached the Consulting Agreement or any other obligations after Travel Zone's purchase.

21.    Wright Travel has failed to carry its burden of establishing that Jon Jones breached the covenant of good faith and fair dealing.

22.    Wright travel has failed to meet its burden to show that any of the alleged breaches of contract caused any damage to Wright Travel, or the amount of any such damages. Proof of damages requires the complaining party to prove two points – first, the fact of damages, and second, the amount of damges. Atkin Wright & Miles v. Mountain States

16

Tel. & tel. Co., 709 P.2d 330, 336 (Utah 1985).  Damages must be proven with

reasonable certainty, and the complainant must show that it suffered damage as a result of

a breach.  Sawyers v. FMA Leasing Co., 722 P.2d 773, 774 (Utah 1986); Cook Assocs.

V. Warnick, 664 P.2d 1161, 1165 (Utah 1983).  Wright travel has failed to show how any

damage was caused by the alleged breaches of which it complains.

23.     Neither Plaintiff nor Defendant is entitled to recover on their respective breach of contract

        claims.  Nor is either party entitled to attorneys' fees or costs and expenses of this

        litigation.

### IV.    Conclusion

        This case involves an unfortunate business relationship made worse by litigation.  Neither

party provided sufficient evidence to prove its claims.  The facts painted a picture of a business

that was successful and harmonious under Mr. Jones' style of management and unsuccessful and

unharmonious after the acquisition by Wright Travel.  The relationship between Ms. Wright and

Mr. Jones although optimistic at the outset, became strained and unproductive.  In hindsight, if

maximizing profits was the goal, the acquisition agreement was poorly structured and Wright

Travel's management of its newly acquired Salt Lake City office was not a model of effective

business practices.  Lack of successful management, however, does not equal bad faith or

intentional efforts to sabotage Mr. Jones' share of the profits.  Nor do Mr. Jones' tepid efforts to

consult equal bad faith or a breach of his contractual commitments.  The seeds of discontent were

sown in the agreement itself, the working relationship that developed between Mr. Jones and Ms.

Wright, and the numerous poor management decisions made by Ms. Wright in connection with

the Salt Lake City office.  But none of these demonstrate beaches of the contract itself or the

implied covenant of good faith and fair dealing.  After all of the evidence was presented, it

became clear this was an unfortunate business merger that had a negative effect on many people,

17

especially the former employees of the Travel Zone.  But the Court finds no breaches of any legal obligations, and therefore, consistent with the findings and conclusions above, the Court grants judgment in favor of the Defendant as to Plaintiff's claims and judgment in favor of the Plaintiff as to Defendant's counter-claims, each party to bear its own costs and attorneys fees.

**IT IS SO ORDERED.**

Dated this 20th day of October, 2006.

United States District Judge
Dee Benson

18